## A. Mayer v. J. W. Springer.

1.   WAREHOUSES—*When Mills are to be Considered as Such.*—A mill where grain is stored for a consideration, whether kept separate or not, is to be regarded as a public warehouse.

2.   BAILMENTS—*What Are, and Not Sales.*—Where wheat is stored in a mill and an agreement is entered into between the proprietor and the person storing it, that the wheat or its equivalent in kind and quantity is to be returned on demand, and the proprietor keeps in store a sufficient amount of wheat to meet such a demand, the transaction is a bailment and not a sale, and the wheat so in store is at the owner's risk.

Assumpsit, for wheat stored in a mill. Appeal from the Circuit Court of White County; the Hon. PRINCE A. PEARCE. Judge, presiding. Heard in this court at the August term, 1900. Affirmed. Opinion filed March 11, 1901.

Statement.—Appellee operated the Riverside Mill at Shawneetown.

In August, 1898, appellant stored wheat in appellee's mill taking the following receipt:

"SHAWNEETOWN, Aug. 19, 1898.
Received from A. Mayer 2142 bushels and 25 pounds of No. 2 Red Wheat to be held in storage for him (A. Mayer) in the Riverside Mills.

J. W. SPRINGER & Co.,
By J. M. White."

In September of the same year, appellant again stored wheat, taking the following receipt:

"SHAWNEETOWN, Sept. 24, 1898.
Received from Mr. A. Meyer the following lots of wheat: 789 46-60 bushels of wheat, testing 56 pounds; 164 46-60 bushels of wheat, testing 55½ pounds; 151 bushels of wheat, testing 50½ pounds.

Signed,
J. W. SPRINGER & Co."

In the summer of 1890, appellant stored 498 bushels referred to as rent wheat. For this lot no receipt was taken, but the evidence shows that it was stored upon the same conditions as the wheat of 1898. Before it was stored appellant knew that appellee had mixed the 1898 wheat with other wheat.

In January, 1899, appellant sold to appellee 1,000 bushels of the 1898 wheat, and in July following, 380 bushels of the rent wheat. In August, 1899, the Riverside mill burned down, together with its contents. This suit is to recover for the wheat of appellant that had not been sold to appellee before the fire. There is no dispute as to the amount remaining, to wit, 2,365 bushels, but appellee insists that all the wheat was stored at appellant's risk, and that he is not responsible for any loss by reason of the fire. Appellant brought suit in assumpsit. The declaration contained four counts, the first count being the common consolidated counts.

Mayer v. Springer.

The second count avers: That plaintiff caused to be delivered to defendant 2,365 bushels of wheat of the value of $2,000 to be safely kept for the plaintiff until demanded, and upon demand to be either redelivered to the plaintiff or paid for at the market price at said time; that in consideration of the plaintiff giving the defendant the option to either redeliver said wheat to the plaintiff when demanded or of paying for the same at the market price at the time of demand, the defendant undertook to take proper care and securely keep the same, and to redeliver the same to the plaintiff when requested, or pay to the plaintiff the market value thereof at the time of said request.

Yet the defendant, disregarding his promises, disposed of a large part thereof and caused the remainder of the same to be mixed with other wheat, not the wheat of the plaintiff, and without the consent of the plaintiff, and thereby converted the said wheat to the use of said defendant. And although afterward requested to pay for said wheat or to redeliver the same, neglected and refused so to do, to the damage of the plaintiff of $2,000.

The third count avers: Negligence and lack of care generally by the defendant whereby plaintiff was damaged, etc.

The fourth count avers: That in consideration that the defendant had the care and custody, etc., and that the plaintiff would give him, the defendant, the option of purchasing the same at such time as the plaintiff should desire to sell, and that he, the defendant, should be allowed the privilege of so purchasing in exclusion of all other persons who might desire to purchase the same at such time, he, the defendant, undertook and promised to take due and proper care thereof while remaining in his custody. Yet the said defendant took so little care thereof that the same became greatly damaged, injured and lost to the plaintiff. By means whereof a cause of action has accrued to the plaintiff, and the defendant is liable to the plaintiff for the said several sums of money, and being so liable, promised to pay to the plaintiff the said sums of money. Yet the defendant, though requested, has not paid the same, or any part thereof, to the damage of the plaintiff of $2,000, etc.

Plea of general issue.

Verdict for defendant and judgment on verdict, from which this appeal is presented.

The errors assigned are: The court erred in withdrawing from the jury that portion of the testimony of Charles Pillow which had reference to the burning of Rowan's mill, etc.; in giving each and every instruction asked by defendant; in refusing each refused instruction asked by plaintiff; in denying the plaintiff's motion for a new trial, and in arrest of judgment, etc.

PARSON & HANLON, J. E. BARTLEY and ROSS GRAHAM, attorneys for appellant.

PARISH & PARISH, attorneys for appellee.

MR. JUSTICE WORTHINGTON delivered the opinion of the court.

Appellee denies any liability and defends upon the grounds:

1st. That there was in the mill when burned, subject to appellant's order, and kept in store for appellant, an amount of wheat equal in quantity and quality to what was remaining of appellant's deposit.

2d. That appellee's mill was a warehouse of class B, and that if there was an amount of wheat in store subject to appellant's order, and equal in quantity and quality to what appellant had remaining, that it was there at appellee's risk.

3d. In case it should be held that said mill was not a warehouse of class B, then appellee insists that the contract of storage was a special contract, requiring appellee to keep in store appellant's wheat, or an amount equal in quantity and quality to it, subject to appellant's demand, and that he, appellee, did so keep wheat to meet appellant's demand, and that if it was so kept the contract of storage made it a bailment and not a sale.

To defend successfully upon either the second or the third proposition above stated, the onus was upon appellee

to prove by a preponderance of evidence, the first proposition.   Upon this proposition the evidence is conflicting, but sufficient to sustain the finding of the jury either way when reviewed by an appellate court.   The jury must have found for appellee upon this proposition and there being ample evidence to sustain that finding if considered alone, we must assume that there was wheat in quantity and quality sufficient to meet a demand from appellee at the time of the fire.

Was the mill a public warehouse of class B, or if it was not, was there a contract that put the wheat in the same status as if it had been a public warehouse?

These were questions of fact for the jury to decide upon instruction from the court as to the law applicable thereto, the onus on these propositions being also on the defendant.

Counsel for appellant asked and the court gave the following instruction, which defines the different classes of warehouses:

" 1.    The court instructs the jury that a public warehouse is a place where grain or other property is stored for a consideration, whether the property stored be kept separate or not; public warehouses are designated by law as classes A, B and C, respectively; warehouses of classes A and B are places where grain alone is stored in bulk, under rules and regulations prescribed by law, and in which grain of different owners is mixed together, while a public warehouse of class C is where property of any kind is stored for a consideration."

Counsel for appellant insist that there is no evidence tending to show that the mill was a warehouse of class B. We think that there is evidence tending to show that it was.

As much of the evidence tending to support the second proposition, also tends to support the third, to avoid repetition the second and the third propositions will be considered together.

Sec. 1 of Art. 13, Constitution of 1870, provides that " all elevators or storehouses where grain or other property is stored for a compensation, whether the property shall be kept separate or not, are declared to be public warehouses."

Paragraph 178 of Chap. 114, Starr & Curtis, after defining public warehouses of Class A, which are located only in cities of not less than 100,000 inhabitants, enacts, that "Public warehouses of class B shall embrace all other warehouses, elevators or granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together."

It is clear from the receipts for the 1898 wheat, that it was stored in the mill, and that to this extent the mill was a warehouse of some character. Appellant and John White, bookkeeper, and part of the time superintendent in the absence of appellee, who was only occasionally at the mill, both testify that the 1899 wheat was stored upon the same conditions as the 1898 wheat. Appellant testifies that "John White said he wanted me to put that wheat on deposit; that he wouldn't charge me anything; that he wanted the refusal of the wheat. I told him certainly, that he should have it. * * * He said that he wanted that wheat and that he could afford to pay me two or three cents more than the maket price for it. That was the wheat of 1898. It was not to be mixed, for we had enough to fill several bins."

Kircher, bookkeeper for appellant, testifies "that appellee wanted it deposited so that they could have the option of buying it."

John White testifies:

"I know that Mayer (appellee) stored wheat in the mill in 1898 and 1899. The 1898 wheat was stored subject to his risk. He was to pay nothing for storage that I know of. He made the trade with me for the 1898 wheat. * * * I was to purchase the wheat at any time that I wanted to, and he wanted to sell, and we could agree upon the price. I think the wheat was put in separate bins but there was no agreement to that effect. * * *

Q. What were the instructions of John W. Springer (appellee) to his employes as to keeping on hand a sufficient amount of wheat to answer all calls for wheat in that mill?

Objected to by defendant; objection overruled and exception.

A. That was his instructions always. When I was

Mayer v. Springer.

there and in the control and management of that mill, I think we kept on hand a sufficient amount of wheat to pay all demands for wheat stored in that mill. (Cross-examination:) * * * When I said we tried to keep the deposits up, I meant we kept a certain number of bushels. As superintendent I just treated the wheat as, one man so many bushels, and another man so many bushels. Mr. Springer was not to return to Mr. Mayer the identical wheat. * * * I told him he could store it in the mill provided that when he got ready to sell, if I would pay him as much as anybody else I was to have the wheat. That was the argument. If he did not want to sell, I was to return to him a like grade and quantity."

Re-direct:

" That is the reason we kept a like grade and quantity in stock."

Appellee testified:

" I know that Mayer deposited wheat there in 1898 and also the 1899 wheat. I told my hands they must keep on hand a sufficient amount of wheat to meet the demands for wheat stored in the mill and not to run below that, and not to grind it up; that wheat might advance and we would lose money on it, and to always keep enough in stock to pay the deposits. I was down in the mill occasionally, every two or three weeks, and sometimes every week. I knew about how much wheat was deposited there. I would examine the bins and see how the stock was being kept up."

This evidence, taken together, tended to prove that storing grain was a part of the business of the Riverside mill. It tended to prove that it was a warehouse or granary in which grain was stored in bulk and in which the grain of different owners was mixed.

Counsel for appellant, however, insist that "the determining character of a place where property of any kind is stored, is whether it is a place of business where a compensation is exacted for property stored, and that there is no evidence in the record that a compensation was ever exacted or a charge made for any storage in appellee's mill." It is true that whether storage was charged for other grain stored in the Riverside mill does not appear in evidence. But from this absence of evidence there can be no presumption of fact that no charge was made. If any presumption

can be indulged from the evidence relating to the storage of appellant's wheat, it would be that storage was charged to others. If not, why contract with him specifically, that he would not be charged storage? If the custom of the mill was not to charge for storage, there would have been no reason for such agreement. But as a matter of fact, the evidence shows that there was a compensation, a consideration valuable in law to appellee, for storing appellant's wheat. Appellant avers this in the second and fourth counts of his declaration and the evidence sustains the averment. It was the option that appellee had to purchase the wheat when appellant wished to sell. This was a compensation as truly as if a money charge had been agreed upon. If then, the jury, under the instruction defining a warehouse as asked by appellant and given by the court, found that the mill was a warehouse of class B, we can not say, in the absence of conflicting evidence, that their finding was wrong.

There is other evidence in addition to that bearing upon both propositions that tends to show a special contract between the parties of the character stated in the third proposition of defense. This evidence explains, too, why, if appellant's 1898 wheat was to be kept in separate bins, as he testifies, it was afterward mixed with other wheat.

In November, 1898, appellant was notified that there was weevil in his wheat. He testifies that he does not know whether it was Dr. Fais or Jim Springer who notified him. Springer testifies that he notified him. There is conflict in the evidence as to the conversations that took place between Springer and appellant, with reference to the wheat on account of the weevil. Springer testifies:

"I told him there was weevil in his wheat, and he would have to have something done with it. He said that he didn't have any room to handle the wheat, and wanted to know if I could reclean it or do something with it. I told him that we could clean some of it, but could not clean all of it, as we did not have the room. He said for us to do the best we could with it; that if we could clean it and grind it that it would be all right with him. We did reclean a part of it. We put some of the wheat back in the bins."

Mayer v. Springer.

John White testified:

"I don't remember the exact date that Mr. Mayer and I had a talk about the weevil in the wheat. He told me that Jim (Springer) had told him that there was weevil in the wheat and that he told Jim to go ahead and do the best he could with it, as he had no place to handle it; that wheat was wheat, and that was all he wanted. I can't give the exact date, as we had several talks about it, but it was in front of his store in Shawneetown."

Appellant denies these conversations with White and Springer, but makes no statement as to what was to be done with his wheat on account of the weevil. Up to this time it is in evidence that none of appellant's wheat had been used by appellee.

Jim Springer testifies that on the 25th day of January (1899), "I bought 1,000 bushels of that wheat (the 1898 wheat) from Mayer, and that about the 22d of July I made a contract for 380 bushels more of the wheat."

(This was the rent wheat, as appears by other evidence.) He further testifies, "I told him (Kercher) that (sixty-eight cents) was what it was worth that day. He said, 'I will sell you the balance of our rent wheat.' I went up and made a contract for the wheat, ground it and shipped it."

Appellant testifies:

"I do not remember the date when I sold the first wheat out of the mill. I think it was Jim Springer who came to the store and bought the thousand bushels. I do not remember how I came to sell it, but I think I was needing some money and had to sell some wheat. It was after I learned of the weevil being in the wheat that I sold it."

The inquiry is naturally suggested, that if appellant was not then claiming ownership of the wheat, why did Springer go to appellant in January, 1899, to buy the thousand bushels, or why, in July, 1899, was a contract made by Kircher to sell the rent wheat? If appellee was using appellant's wheat with the understanding that he was to pay the market price for it at such time or times as appellant desired to sell, the inference would be that appellant would notify appellee when he desired to sell. Appellee would have been under no obligation to tell appellant that he

wanted to buy his wheat.   All that would have been neces-
sary would have been for appellant to call for his money at
the market price of such wheat as he wanted to sell.

Jim Springer testifies:

" He (Mayer) only demanded wheat of me these two times
and both times I had the wheat.   We kept other wheat on
hand to meet our deposits.   As to the 1899 crop, they hauled
in, I suppose, four or five hundred bushels.   I kept sufficient
wheat on hand to meet that crop."

We can not say upon which of the two propositions, the
second or the third, the jury found for appellee.   There is
evidence tending to support both, to such an extent, that
under well established rules, this court is not warranted in
setting aside their finding.   So holding, it was not error
for the court to give for the defendant the instructions
criticised by appellant, upon the ground that there was no
evidence upon which to base them.

If the mill was a warehouse of class B, or if at any time
while stored an agreement was entered into that the wheat
or its equivalent in kind and quantity was to be returned
on demand, and defendant kept in store and had in store at
the time of the fire, a sufficient amount of wheat to meet
such demand, then the deposit was a bailment and not a
sale, and the wheat in store was at appellant's risk.   Arlin-
ger et al. v. Wright, 38 Ill. App. 98; Yockey v. Smith, 181
Ill. 564; Am. & Eng. Ency., Vol. 3, p. 737.

Instruction numbered two asked by appellant is incom-
plete and was properly refused.

Instructions three, four, five, six and fourteen refused,
state the common law rule, without noting the exceptions
that exist when grain is deposited in a public warehouse
under the statute, or under a special contract which puts
the wheat in the same status as if deposited in a public
warehouse.

Instructions nine and thirteen are not based upon any
evidence in the case.   The evidence was not that " the miller
was to pay the market price when called for," but that he
was to have the option to buy when appellant wished to sell.

Instruction seven concludes thus:

"And in this case if the jury find from the evidence that the defendant, Springer, received for storage in his mill certain wheat from the plaintiff, Mayer, and assumed no obligation to return to said Mayer the identical wheat stored, or the product thereof, and was at liberty to return other wheat of like kind and equal value therefor, then such deposit was a sale, and said Springer became liable to pay said Mayer the value thereof."

This is misleading. If after the words "and assumed no obligation to return to Mayer the identical wheat stored, or the product thereof," it had added, "or wheat equal in quantity or quality," it would have stated the law as applicable to the facts of this case.

Omitting such qualifying words, it was properly refused.

No reference being made by counsel for appellant to their first assignment of errors, it is treated as waived. Judgment affirmed.